

**SIGNED this 01st day of September, 2011.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-12896-CAG |
| | § | |
| GRADY TECUMSEH ATKINS, | § | CHAPTER 7 |
| Debtor. | § | |

| | | |
|---|---|---|
| MICHAEL D. RANDALL and | § | |
| JASON L. RANDALL, | § | |
| Plaintiffs, | § | |
| | § | ADV. NO. 10-01028- CAG |
| v. | § | |
| | § | |
| GRADY TECUMSEH ATKINS | § | |
| Defendant. | § | |

### MEMORANDUM OPINION GRANTING THE PLAINTIFFS' COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND OBJECTION TO DISCHARGE

Came on to be considered for trial on February 24 and 25, 2011, the Plaintiffs' Complaint

to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a) (2, 4, and 6) and 11 U.S.C.

§ 727(a) (2, 3, 4, 5, and 7).  For the reasons stated herein, the Court finds that the Defendant's

debt to Plaintiffs is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) and (a)(6), and the Defendant will not receive his Chapter 7 discharge under section 727(a)(2), (a)(5) and (a)(7).

As an initial matter, the Court finds that it has jurisdiction over this proceeding pursuant to 28 U.S.C. § 157 and 1334. This matter is a core proceeding as defined under 28 U.S.C. § 157(b)(2)(I) (determination of discharge of particular debts) and (J) (objections to discharge). The Court finds venue is proper under 28 U.S.C. § 1408(1). This matter is referred to the Court pursuant to the District's Standing Order on Reference. The Court may make its findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

Defendant Grady Atkins is or was the owner, founder, and insider of Scooter Revolution. Plaintiffs Michael D. Randall ("MDR") and Jason L. Randall ("JLR") are individual creditors of Defendant Atkins in the Scooter Revolution bankruptcy and Defendant Atkins' individual bankruptcy. *In re Scooter Revolution, LLC*, Case No. 09-12410-CAG, Chapter 7*; In re Grady Tecumseh Atkins*, Case No. 09-12896-CAG, Chapter 7, in the United States Bankruptcy Court for the Western District of Texas, Austin Division.

Initially, on or about April 4, 2008, MDR loaned $46,720 to Atkins to finance the Scooter Revolution business. The terms of the first note expressly stipulated that the loan proceeds could only be used for business purposes.

In May of 2008, MDR loaned Atkins an additional $59,840. The second note provided that the proceeds would be used only for the purchase of 64 specific scooters, 48 Vintage and 16 Milan models. These scooters would be security for the note and an installment was to be paid within seven days of a completed sale of any identified scooter. Additionally, the second note

required that Atkins provide bi-monthly reports of the inventory and sales status of the collateral scooters.

In the summer of 2008, Defendant and Plaintiffs discussed the financing of a large order of scooters from China.  On or about July 22, 2008, Atkins received a quote from Flyscooters, LLC, a China-based scooter manufacturer.  On or about July 23, 2008, Atkins provided the Plaintiffs with invoice number 1239, which provided a quote for the sale of 200 Moderna scooters, 72 Kina scooters, and 65 Barcelona scooters (a total of 337 scooters) for approximately $340,567.  This estimate included port fees, shipping and handling, and parts.

On or about August 5, 2008, Plaintiffs loaned Defendant Atkins and Scooter Revolution $332,065 expressly for this large purchase of scooters and entrusted the funds to Atkins.  This third promissory note specified that the proceeds would be used only for the purchase of the 337 specific scooters:  200 Moderna, 72 Kina, and 65 Barcelona models.  Defendant Atkins executed the note and represented that he would spend the funds only on 337 specified scooters.  Plaintiffs relied on Defendant's representations.

Within a few days of the third note's execution, Atkins placed a large order with Flyscooters, LLC.  Defendant Atkins did not order the 337 scooters, but 290 scooters in total. On or about August 9, 2008, Defendant Atkins wired $113,821.67 to Flyscooters, LLC, purportedly in payment of invoice number 1849, not invoice number 1239.  Defendant Atkins informed Plaintiffs of the transfer of funds, but did not tell them that he had not ordered the 337 scooters as promised.  On or about February 10, 2009, Defendant Atkins transferred another $150,000 to Flyscooters, LLC.

These were the only two large, lump sum wire transfers made in connection with the large scooter order and they total only $263,821.67; this is $68,243.33 less than the total amount

of the third loan. Defendant only purchased 290 scooters (182 Moderna, 54 Kina, and 54 Barcelona).

**PARTIES' CONTENTIONS**

Between the two of them, Plaintiffs Michael D. Randall and Jason L. Randall made three loans for approximately $438,000 to Defendant Grady Atkins to finance Scooter Revolution, LLC. Plaintiffs allege that Defendant obtained this financing by false pretenses, a false representation, or actual fraud by promising to use the loan proceeds to purchase specific inventory (which was to serve as collateral for the loans), and by misrepresenting the financial condition of Scooter Revolution. Further, Plaintiffs allege that Defendant Atkins, with the intent of deceiving Plaintiffs, made use of materially false statements in writing about the financial condition of Scooter Revolution on which Plaintiffs reasonably relied.

Additionally, Plaintiffs allege that these debts are not dischargeable because Defendant Atkins committed fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. Plaintiffs further allege that the debt is not dischargeable because Defendant caused willful and malicious injury to the Plaintiffs.

Under 11 U.S.C. § 727(a), Plaintiffs allege that Defendant Atkins concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including books, documents, records, and papers, from which his and Scooter Revolution's financial condition and business transactions might be ascertained, and that such acts and failures to act were not justified under the circumstances of the case.

Finally, Plaintiffs allege that Defendant Atkins and his wife filed false claims and made misrepresentations in connection with Defendant's personal bankruptcy and the bankruptcy of Scooter Revolution. In response, Defendant denies Plaintiffs' allegations.

## FINDINGS OF FACT

This adversary proceeding illustrates what can happen when friends become business partners and enter into a business relationship without the assistance of counsel. MDR met Atkins in 2004 when Atkins became a tenant at one of MDR's rental properties. Soon thereafter, MDR and Atkins became social friends. MDR hired Atkins as a computer technician to help with the network for his business Freedom Holdings Co. ("Freedom"). Freedom is in the business of selling tickets for concerts and sporting events.

After working for MDR for about six months, Atkins approached MDR about sponsoring a business venture with seed capital of $10,000 to start up a scooter business in Austin, Texas. Thereafter, Atkins and MDR entered into a promissory note ("Note One") on April 4, 2008, in the total amount of $467,720. (See Plaintiffs' ("P") exhibit 1.) Note One was the consolidation of prior notes MDR had given Atkins that were for operating capital. Note One extended the term of the earlier notes and lowered the monthly payments. The loan was described for business purposes only. MDR drafted Note One and the parties entered into the agreement without the assistance of counsel.

In May 2008, Atkins and MDR entered into a second promissory note ("Note Two") in the principal sum of $59,840. (P-2.) Note Two was a newly originated note for the acquisition of inventory. Atkins used the loan proceeds to purchase 48 Vintage and 16 Milan scooters for his store inventory.

Shortly thereafter, on August 5, 2008, both Plaintiffs and the Defendant entered into a third promissory note ("Note Three") for the purchase of 337 scooters from China. (P-3.) The purchase of scooters was to include 200 Moderna, 72 Kiva, and 65 Barcelona scooters. The scooters were to bear the Scooter Revolution name. Note Three was labeled for "business

purposes only," for the limited purpose of purchasing inventory with a due date of December 31, 2010.

During the process of making these loans and thereafter, the Randalls corresponded with Atkins generally by email regarding the status of the business and how sales were progressing.  It should be noted that notwithstanding the personal relationship the parties had forged over roughly four years, neither party had sought any professional advice (legal or business) regarding the operation of the business.  Atkins' unrebutted testimony was that he had little past high school education, a modicum of sales experience based on online cutlery sales, and a business acumen premised on "on the job learning."

The course of dealings after Atkins received the proceeds of the three promissory notes was largely memorialized by emails.  For example, on August 5, 2008, Atkins advised the Randalls that he would pay 30% of the cost of the inventory from China upfront, and the balance when the scooters were delivered.  (P-95.)  On November 18, 2008, Atkins advised the Randalls that he had placed the order for the 337 scooters and that he had paid the 30% down payment and reserved the remaining 70% for payment upon receipt of the inventory.  (P-152.)

After receipt of the purported inventory of 337 scooters from China, there was a gap in correspondence between the parties.  Notably, the next email Atkins sent the Randalls of relevance was on March 28, 2009, asking the Randalls for additional monies to fund the purchase of a forklift to move inventory.  (P-100.)  On April 10, 2009, Atkins told the Plaintiffs that Scooter Revolution had been "burning cash" and that Atkins only had 290 scooters from the purchase from China to collateralize Note Three.  Nonetheless, Atkins gave the Randalls assurances that notwithstanding the difference in inventory to secure Note Three – the 47

scooters – Atkins had other inventory that could serve as security and a basis for repayment of the note upon sales of the scooters.  (P-99.)

The testimony of the parties indicates that Atkins at no time until April 2009 told the Randalls that he had purchased less than the 337 scooters contemplated in the order from China, nor had Atkins told MDR and JLR that he had used the proceeds from Note Three for purchases other than the scooter inventory.  Moreover, the Randalls were adamant in not knowing about the circumstances regarding the purchase or lack thereof of the 337 scooters.

After learning that Atkins had not used the Note Three loan proceeds to purchase the 337 scooters, the Randalls and Atkins entered into "Amendments to Promissory Note Dated August 5, 2008 Between Payor (Grady T. Atkins and Scooter Revolution, LLC) and Payee (Michael D. Randall and Jason L. Randall)" which was dated April 13, 2009.  (P-4.)  The Amendments contained the following recitations:

April 13, 2009

BACKGROUND

The Promissory Note dated August 5, 2008 Between Payor (Grady T. Atkins And Scooter Revolution, LLC) And Payee (Michael D. Randall and Jason L. Randall) shall be referred to in this document as "the Note".

It has been determined that the funds disbursed under the agreement have been used other than as specified under the "Terms – Use of Funds" section of the Note (Section 2, Paragraph A of agreement).  Specifically, while Payor agreed to purchase 337 scooters with the fund proceeds (200 Moderna, 72 Kina, 65 Barcelona), only 290 scooters were actually purchased (182 Moderna, 54 Kina, 54 Barcelona), with the remainder of funds provided used for purposes not authorized by the Note.  Thus, a material breach of the Note terms has occurred, placing the Payor in Default as defined in the Note (Section D, Item No. 7).

This default allows that the Principal plus interest specified in the Note is immediately due in full.

REMEDY OF DEFAULT

Payor and Payee wish to provide remedy for this default by amendment of the Note terms as follows:

1.)     The following section is to be added to the Note:

6.       MISCELLANEOUS – NEW PARAGRAPH ADDED AS FOLLOWS:

Payee agrees to purchase insurance protecting the value of the scooter inventory collateralized by the Promissory Note.  Insurance amount is to be no less than the total amount due Payor under the terms of the Promissory Note (including Amendments).  Payee agrees to name Payor as loss payee on the insurance policy, and to have insurance in force no later than April 30, 2009.

After the amendment to Note Three, Defendant recounted dismal sales activity in emails to Plaintiffs.  For example, in June 2009, Atkins acknowledged that only two of the 290 scooters had been sold.  (P-140.)  Thereafter, Atkins told the Randalls in July 2009 through a report that he periodically provided to the Plaintiffs that there were no sales of scooters between May 1– June 30 of 2009, and that only one scooter was sold in July 2009.  (P-130.)[1]

In fact, the report that the Defendant provided to the Plaintiffs in July 2009 was the last report of its kind that Plaintiffs received.  Moreover, Atkins testified that there had been limited sales for May-August 2009.  Defendant made no further payments to Plaintiffs after July 1, 2009.

Given the lack of sales revenue, Atkins had no choice but to file Chapter 7 bankruptcy, both personally and for Scooter Revolution in 2009.   The Chapter 7 trustee for Scooter

---

[1] Plaintiffs testified that they routinely talked with Defendant about not using loan proceeds for non-inventory and parts purchases.  As explained more fully herein, had the Plaintiffs known about Defendant's unauthorized purchases, they would have taken legal action sooner.

Revolution liquidated the remaining inventory and parts for roughly $100,000, which was in turn paid to Plaintiffs.[2]

There are several grounds on which Plaintiffs challenge Atkins' discharge of their debt and Atkins receiving a discharge under section 727(a).  By way of background, Scooter Revolution was created as an LLC with Atkins being the only member.  The retail location and warehouse for inventory were at separate locations.  Scooter Revolution also offered repair shop services.  Scooter Revolution sold both scooters and related merchandise.  Atkins explained that Scooter Revolution's expenses included labor, rent, taxes, and warehouse operations.  It is undisputed that Defendant received all of the loan proceeds for Notes One, Two and Three.  Additionally, Scooter Revolution's bankruptcy schedules indicate $400,000 in gross revenues for 2008 and $100,000 for gross revenues in 2009.  Further, at time of filing of Scooter Revolution's bankruptcy petition, Scooter Revolution had no cash on hand.  Atkins also maintained that all loan proceeds went to pay expenses of Scooter Revolution.

Atkins' testimony clearly demonstrated that he did not adhere to any recognized accounting practices.  Atkins did not use QuickBooks, failed to account for expenses such as insurance, and ultimately paid employees with cash drawn from various ATM machines.  Further, Atkins testified that employees were treated as subcontractors, but not all employees were issued Form 1099s.  In sum, it is difficult to understand what was Scooter Revolution's business model, let alone which employees were retained or the duration of their employment.

In addition, Atkins' lack of recordkeeping was further compounded by the manner in which he maintained the computers for Scooter Revolution.  Although the evidence was convoluted as to the numbers and ownership of business computers, the evidence was clear that

---

[2] The Chapter 7 trustee's final account and distribution (doc. #63) indicates that MDR had an allowed claim of $58,397.36 that was paid in full.  Further, MDR and JLR had a combined allowed claim of $342,457.64 of which the Randalls received $45,292.82 on their allowed unsecured claim.

Atkins wiped data from Scooter Revolution's main computer, which effectively deprived the Chapter 7 trustee from investigating the business affairs of Scooter Revolution. Atkins claimed that the actions were unintentional and the result of him installing Microsoft Windows to company computers. Nonetheless, the "wiping" of the computers occurred about one month prior to bankruptcy. Atkins admitted that he was contemplating bankruptcy at the time the computer's hard drive was wiped. Further, Atkins never told the Chapter 7 trustee about the existence of the hard drive nor was the drive ever produced.

There are also other considerations that factor into the Court's analysis. The evidence was uncontroverted that Atkins used loan proceeds for items that appear to be personal expenses – lunch and dinner with his wife, Xbox purchases, iTunes purchases, and in varying amounts without reference to how the cash was spent. (P-20, 21, 22, 24, 25, 26, 27, 28, 29, 30-36, bank statements for Scooter Revolution's business account ending in 7852).

The Plaintiffs provided summaries of evidence that demonstrated that the Defendant had expended significant sums of cash that did not relate to purchasing scooter inventory, merchandise or parts. Atkins withdrew $75,601.67 in ATM/cash withdrawals. Atkins explained that the withdrawals were to pay employees in cash or for business expenses. There is no way to verify the credibility of that statement. As noted, there are no records of what employees were paid because the Defendant did not use a payroll service. Atkins stated that all of the cash payments for payroll were made from the same ATM location. Further, he wiped Scooter Revolution's computers by installing Microsoft Windows. As such, the Court cannot tell which employees were paid salaries in cash over time. (*See* P-20, 21, 22, 24-36, Scooter Revolution's April 2008-August 2009 UFCU bank statements for Scooter Revolution Account No. 7852.)

The Plaintiffs provided a summary of "entertainment expenses" that included purchases for Xbox Live, Vista Day Spa, and Apple iTunes.  The total cost of the purchases was $754.83. (*See* P-20-36, Scooter Revolution's April 2008-August 2009 bank statements for Scooter Revolution Account No. 7852.)  Atkins explained on examination that the reasons for the purchases was to provide some form of relaxation from the stress of operating Scooter Revolution.  The Plaintiffs were able to show that Atkins alone, or with his wife, spent a significant amount of money on lunch, dinner, coffee, or drinks that totaled $2,348.54 which was paid from Scooter Revolution's bank account.  (P-20-36.)  On examination, both Atkins and his wife Ginny Catania explained that the food and beverage purchases related to business discussions or meetings, including meals with MR.

In addition, the evidence presented to the Court also demonstrated a questionable business practice including the commingling of business and personal accounts, and Atkins' ongoing failure to account for inventory collateral to the Plaintiffs.  The evidence was uncontroverted that Atkins maintained one business account for Scooter Revolution – an account at UFCU ending in 7852.  The Defendant and his wife kept three accounts of their own – Defendant's sole account ending in 4692; a joint account for Defendant and his wife ending in 1457; and a separate account for Ginny Catania ending in 7720.

Scooter Revolution's bank statement records show that on August 5, 2008, the proceeds of Note Three ($332,065) were deposited into Scooter Revolution account 7852.  Note Three required Atkins to keep sufficient proceeds on hand to pay for all the inventory – 337 scooters – to be acquired from China.  (P-3, 24.)  There is no dispute that Atkins remitted $113,821.67 to the manufacturer for the 30% down payment on August 9, 2008.  (P-24.)  As such, Atkins was required to keep at least $218,000 in note proceeds for the purchase of the remaining inventory

from China.  While Note Three does not specify which account the loan proceeds are to be kept, the note requires and the parties understood that the note proceeds could only be used for scooter inventory purchases.

As early as August 15, 2008 (P-24), and then continually from September 1, 2008 (P-25) through February 28, 2009 (P-30), the Defendant never had sufficient loan proceeds to pay for remaining inventory from China or otherwise secure Note Three.  During the time frame from August 2008-February 2009, the Defendant also engaged in a series of purchases for personal items and expenses plus unspecified cash withdrawals.  A review of the Defendant's and his wife's bank accounts shows transfers from Scooter Revolution's bank account in the following total amounts of $10,000 to Atkins' account no. 4692; $86,700 to the Catania/Atkins joint account 1457; and $5,000 to Catania account 7720.  The testimony of Atkins and Catania was that those monies were ultimately remitted to the Scooter Revolution account.  Assuming that to be true, the Plaintiffs demonstrated that the Defendant was unable to keep a remaining inventory available to be sold, plus cash equal to satisfy the outstanding indebtedness on Note Three.

The Plaintiffs also showed that over the course of time Atkins failed to report sales of scooters to the Randalls.  Atkins was required to, and did for a period of time, provide periodic reports to the Plaintiffs regarding scooter sales.  Plaintiffs did not receive a report of a sale or receive sale proceeds of the following scooters:

| Note | Scooter (Model - ID - VIN) | Date Sold | Sale Date Reported to Randalls |
|---|---|---|---|
| 2 | V36-White Vintage Vin No. L5YTCKPA881207362 | July 22, 2008[1] | August 4, 2008[2] |
| 2 | M5 – White Milan VIN No. L5YTCKPA181185687 | May 13, 2009[3] | Never Reported[4] |
| 2 | V41 – Blue Vintage VIN No. L5YTCKPA 381207561 | May 14, 2009[5] | Never Reported[6] |
| 3 | V289 – White Moderna VIN No. L5YTCKPA191107444 | May 20, 2009[7] | July 1, 2009[8] |
| 2 | V136 - Black Moderna VIN No. L5YTCKPA091107449 | June 13, 2009[9] | Never Reported[10] |
| 3 | V37 – White Vintage VIN No. L5YTCKPA281207356 | June 30, 2009[11] | Never Reported[12] |
| 3 | V188 – Blue Moderna VIN No. L5TCKPA191107461 | July 3, 2009[13] | Never Reported |
| 3 | V67 – Light Blue Kina VIN No. L5YTCKPB491107592 | July 15, 2009[14] | Never Reported |
| 3 | V221 – Pink Moderna VIN No. L5YTCKPA791107481 | July 23, 2009[15] | Never Reported |
| 3 | V4 – Black Barcelona VIN No. L5YTCKPA591107351 | July 31, 2009[16] | Never Reported** |

| Note | Scooter<br>(Model -  ID - VIN) | Date Sold | Sale Date<br>Reported to Randalls |
|---|---|---|---|
| 3 | V1 – Black Barcelona VIN No. L5YTCKPA991107370 | Aug. 3, 2009[17] | Never Reported |
| 3 | V154 – Green Moderna VIN No. L5YTCKPA591107561 | Aug. 12, 2009[18] | Never Reported |
| 2 | V39 – Blue Vintage VIN No. L5YTCKPA481207570 | Aug. 14, 2009[19] | Never Reported |
| 3 | V139 – Jade Metallic Moderna VIN No. L5YTCKPAX91107569 | Aug. 19, 2009[20] | Never Reported |
| 3 | V80 – Green Kina VIN No. L5YTCKPB591107620 | Aug. 28, 2009[21] | Never Reported |

[1] P-105, Sales Order and Invoice
[2] P-104, Email with Attachment, from G. Atkins to M. Randall (July 31, 2008); P-106 Email from G. Atkins to M. Randall (Aug. 14, 2008)
[3] P-125, Title Application Receipt, Sales Order, and Invoice
[4] *See* P-130, Email with Attachment, from G. Atkins to M. Randall, J. Randall (July 1, 2009)
[5] P-124, Sales Orders, Invoices, Title Application Receipt, Registration and Title Information
[6] *See* P-130, Email with Attachment, from G. Atkins to M. Randall, J. Randall (July 1, 2009
[7] P-131, Title Application Receipt, Sales Orders
[8] *See* P-130, with Attachment, from G. Atkins to M. Randall, J. Randall (July 1, 2009)
[9] P-132, Invoices, Sales Order, Registration and Title Information, Title Application Receipt
[10] *See* P-130, with Attachment, from G. Atkins to M. Randall, J. Randall (July 1, 2009)
[11] P-126, Invoices, Title Application Receipt, Sales Order
[12] *See* P-130, with Attachment, from G. Atkins to M. Randall, J. Randall (July 1, 2009)
[13] P-127, Title Application Receipt
[14] P-133, Invoices, Registration and Title Information (IMA – Confirm)
[15] P-134, Invoice, Registration and Title Information, Title Application Receipt
[16] P-135, Sales Order, Refund**, Registration and Title Information, Title Application Receipt
[17] P-136, Invoices, Registration and Title Information, Title Application Receipt
[18] P-137, Invoices, Registration and Title Information
[19] P-128, Invoices, Sales Order, Registration and Title Information
[20] P-138, Sales Order, Invoice, Registration and Title Information, Title Application Receipt
[21] P-139, Registration and Title Information

In response to the weight of the evidence that the Plaintiffs provided, Atkins offered several arguments to deflect or discount Plaintiffs' assertions.

First, the Plaintiffs advanced the theory that the home in which Atkins and Catania resided was their homestead.  Further, there was a suggestion that possibly the homestead could be imposed with a constructive trust if it could be shown that the home was purchased with proceeds from the Randall notes.

The evidence presented shows that Ginny Catania purchased the home prior to her marriage to Atkins on May 5, 2008.  (Defendant ("D") D-1.)  The basis for Plaintiffs' claims against Defendant was that Ms. Catania refinanced the home after marriage and, as a result, Atkins had to be on the note and deed of trust.  (D-2, 3.)  There is no other evidence that

demonstrates that any of the loan proceeds were used to purchase or refinance Catania's home. As such, the Court can find no basis for imposing a constructive trust on Catania's home.

Second, Catania testified that the purpose of the transfer between Scooter Revolution's and her accounts was to ensure that payments and sales were properly tracked. Catania also explained that the Note Three loan proceeds were apportioned between business and personal accounts to keep balances under FDIC insurance limits. Catania also acknowledged in an April 2009 email (P-145) to the Randalls that the Defendant had not ordered the 337 scooters as promised but this was in part due to an increase in Scooter Revolution's expenses. Catania testified that notwithstanding her recognition that "Grady had screwed up," she desperately wanted to renegotiate new loan terms with a higher interest rate to stave off Plaintiffs' collection efforts.

The Defendant explained that he had minimal post-high school education and no accounting experience. It also appeared from Atkins' testimony that his computer knowledge was acquired through on the job training. He disputes the Plaintiffs' contentions that there was no computer data given to the Chapter 7 trustee. Atkins maintains that MR gave him two Dell workstations to use for Scooter Revolution. Atkins testified that he returned the computers to MR after wiping them clean. Atkins stated that the main service computer with Scooter Revolution data was given to the trustee.

## ANALYSIS

### 11 USC § 727

(a)     The court shall grant the debtor a discharge, unless—
(2)     the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed—
(A)     property of the debtor, within one year before the date of the filing of the petition; or

(B)     property of the estate, after the date of the filing of the petition;

(3)     the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4)     the debtor knowingly and fraudulently, in or in connection with the case—

(A)     made a false oath or account;

(B)     presented or used a false claim;

(C)     gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D)     withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

(5)     the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;—

(7)     the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the filing of the petition, or during the case, in connection with another case under this title or under the Bankruptcy Act, concerning an insider.

### VIOLATION OF 11 U.S.C. § 727(a)(2), 727(a)(3), 727(a)(4), 727(a)(5), AND 727(a)(7)

Plaintiffs object to the granting of a discharge of Defendant pursuant to § 727(a)(2), 727(a)(3), 727(a)(4), 727(a)(5), and 727(a)(7).  11 U.S.C. § 727(a) provides that a court must grant a discharge unless one or more grounds for denial of discharge under section 727(a)(1-12) is proven to exist.  The burden of proving a denial of discharge under section 727(a)(1-12) is by a preponderance of the evidence.  *Beaubouef v. Beaubouef*, (*In re Beaubouef*), 966 F.2d 174 (5th Cir. 1992).

In addition, the Court notes that Plaintiffs have pled a cause of action under section 727(a)(7).  Section 727(a)(7) provides in relevant part that a discharge in the individual's case may be denied for act under 727(a)(2-6) in connection with another case filed under Title 11.  As

such, much of what Plaintiffs assert regarding the actions of the Defendant did not occur in his individual Chapter 7 case, but rather in the Scooter Revolution Chapter 7 case.

Section 727(a)(2)

To sustain an objection under section 727(a)(2), the proof must show:

-- that the act complained of was done within the one year before the date of the filing of the petition;

-- that the act was done with actual intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;

-- that the act was that of the debtor or a duly authorized agent of the debtor;

-- that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

Section 727(a)(2) is intended to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets.

A debtor will not be denied a discharge under section 727(a)(2) unless it is shown that the act complained of occurred (1) with respect to property of the debtor, within one year before the date of the filing of the bankruptcy petition, or (2) with respect to property of the estate, after the filing of the petition.

As such, section 727(a) requires that the act complained of must be done with intent to hinder, delay, or defraud a creditor. *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89 (5th Cir. 1989). Further, the intent must be actual intent and not constructive intent. *First Tex. Sav. Ass'n, Inc. v. Reed (In re Reed)*, 700 F.2d 986 (5th Cir. 1983). That said, a finding of actual intent may be based on circumstantial evidence or inferences from a course of conduct. *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751 (9th Cir. 1985).

The Fifth Circuit has identified the following factors that may provide evidence of actual intent to defraud: (i) a lack of inadequacy of consideration, (ii) a familial or close relationship between the parties (iii) retention of possession, benefit, or use of the property in question, (iv) the financial condition of the party sought to be charged both before and after the transaction in question, (v) the existence or cumulative effect of a pattern or course of conduct after the incurring of a debt,

onset of financial difficulties or threat of suits by creditors, and (vi) the general chronology of the events and transactions at issue.

*TSCA-234 Limited P'ship v. Moseman (In re Moseman)*, 436 B.R. 398, 408-09 (Bankr. E.D. Tex. 2010), citing *Pavy*, 873 F.2d at 91.

Moreover, for purposes of analyzing what constitutes a transfer under section 727(a)(2), the definition of transfer is to be applied as broadly as possible. *See e.g. Village of San Jose v. McWilliams*, 284 F.2d 785 (7th Cir. 2002).

In analyzing the elements under section 727(a)(2), all are easily demonstrated but for the intent to defraud which requires an analysis under the Fifth Circuit's test in *Pavy*. The Plaintiffs showed that the loss of funds from Note Three occurred within a year of the petition date. Second, that the acts were done by Scooter Revolution's only member of the LLC – Grady Atkins – who is the Defendant. Third, that the acts consisted of transferring money to the Defendant's and/or wife's personal account, that Note Three loan payments were dissipated without explanation, that there were unauthorized payments for the Defendant and his wife from Scooter Revolution's business account, and that scooters were sold and not reported to the Plaintiffs.

Using the Fifth Circuit's test in *Pavy*, the Court finds that Plaintiffs have met their burden under section 727(a)(2)(A) in establishing the requisite intent to hinder, delay or defraud a creditor.

(1)     <u>Lack or Inadequacy of Consideration</u>.  The evidence was unequivocal that the Plaintiffs provided sufficient loan proceeds to purchase the 337 scooters as provided for in Note Three.  (P-3.)  Defendant admitted that he did not purchase the entire inventory of 337 scooters but 290.  (P-4.)  Further, the Plaintiffs demonstrated that notwithstanding the two payments that Defendant made for the 337 scooters, there were insufficient loan proceeds available in the

17

Scooter Revolution account or Defendant and/or his wife's personal account. The Defendant was unable to show that he had other scooter inventory to secure the outstanding loan balance for Note Three.

(2)      <u>A Familiar or Close Relationship Between the Parties</u>.  The evidence was clear that the Defendant and Plaintiffs were social friends; that the Defendant had previously worked for the Plaintiffs; and that Plaintiffs and Defendant mutually agreed to start Scooter Revolution.

(3)      <u>Retention of Possession, Benefit, or Use of the Property in Question</u>.  The Plaintiffs were able to prove that Defendant had engaged in a series of acts whereby Defendant had misused loan proceeds.  As noted, Defendant did not purchase 337 scooters from China as required under Note Three.  The Plaintiffs showed in their analysis of the Defendant's business and personal accounts that there were insufficient proceeds in the accounts to satisfy the remaining balance due on Note Three.  The Defendant also could not explain the non-business purchases for food and entertainment or how they were relevant to the operation of Scooter Revolution.  (P-20-37.)  Further, as detailed in this opinion, the Defendant also failed to account for the sale of inventory to Plaintiffs.

(4)      <u>The Financial Condition of the Party Sought to Be Charged Both Before and After the Transaction in Question</u>.  While the record does not reflect how the Defendant's overall financial condition changed, the record is clear that the Defendant and his spouse benefitted financially from using loan proceeds for personal items and expenses rather than for the payment of the note obligations to Plaintiffs.  Further, there were sums of money transferred from the Scooter Revolution bank account to Atkins' personal account (#4692) in the sum of $10,000; to the Catania/Atkins joint account (#1457) in the sum of $86,700; and to the Catania account (#7852) in the amount of $2,000.  The Defendant did not account for these transfers of money to

their accounts or what they were used for other than business expenses. *Cf.* (P-20-36 with P-38-56 and P-57-66.)

(5)    The Existence or Cumulative Effect of the Pattern or Series of Transactions or Course of Conduct after the Incurring of Debt, Onset of Financial Difficulties, Or Pendency or Threat of Suits by Creditors.    As related herein, after the Note Three loan proceeds were disbursed to Defendant, the Defendant failed to account for the disposition of loan proceeds, failed to track personal purchases and payments from Scooter Revolution's account for personal expenses, and did not account for or remit sales proceeds on the sale of some of the scooters.  All of this occurred after Atkins failed to pay in full for the purchase of the 337 scooters.

(6)    The General Chronology of the Events and Transaction Under Inquiry.  The court finds this factor cumulative of factors 1-5 in this instance.

The Court finds that by applying the ***Pavy*** factors and in analyzing the other elements under section 727(a)(2), the Plaintiffs have met their burden under section 727(a)(2)(A).

Section 727(a)(2)(B)

Scooter Revolution filed a Chapter 7 petition on August 28, 2009, and Grady Atkins filed a Chapter 7 petition on October 12, 2009.  The vast majority of all the acts were committed prior to the petitions being filed.  The Court finds that the Plaintiffs have not met their burden under section 727(a)(2)(B) which requires that property of the estate was fraudulently transferred. Although there was some evidence to suggest small transfers after the filing of bankruptcy, the Court finds the evidence insufficient under section 727(a)(2)(B).

Section 727(a)(3)

In sum, the Court may deny the Defendant's discharge under section 727(a)(3) if the Plaintiffs can demonstrate that the Defendant failed to keep records that "are those of creditors

and that the [Debtor] is required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." ***Koufman v. Sheinwald***, 83 F.2d 977 (1st Cir. 1936).

Under section 727(a)(3), the debtor's obligation is to keep records in a form that enables a creditor to ascertain the debtor's current financial condition and to follow his business transactions in the past. *See **In re Juzwiak***, 89 F.3d 424 (7th Cir. 1996) (no proof of payroll records). As such, the Court must examine the materiality of the missing business transactions.

Plaintiffs complain of Defendant's lack of recordkeeping as a basis of denial of discharge. Plaintiffs maintain that the wiping of Scooter Revolution's main computer deprived them of valuable information. The Plaintiffs argue that the lack of payroll information and general recordkeeping deprived them of valuable information they needed to prosecute their case.

That said, the Plaintiffs were able to get all necessary bank statements and Scooter Revolution business reports when Atkins prepared them. There were a multitude of emails evidencing the course of dealings between the parties. Further, the Plaintiffs had access to sales orders, invoices, title application receipts and scooter registrations that not only allowed the Plaintiffs to account for sold and missing scooters, but to know precisely which scooter sales were reported.

Finally, while the Defendant should have kept better business records, there is little doubt that Plaintiffs were provided access to all information in the possession of Atkins and his wife. As explained herein, the Defendant did not have a sophisticated business background or training.

The Court finds that the missing business records were not so material that the Plaintiffs were unable to conduct their case.  As such, the Plaintiffs' claims under § 723(a)(3) are denied.[3]

Section 727(a)(4)

11 U.S.C. § 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account. . . ."  Plaintiffs allege that Debtor made a number of omissions and/or false statements in his sworn Schedules of Assets and Liabilities and Statement of Financial Affairs, each of which will be discussed in detail below.

In general,

> [t]he purpose of Chapter Seven of the Bankruptcy Code is to give individual debtors a "fresh start," and the heart of this goal is embodied in § 727's discharge provisions. *See, e.g.,* S.Rep. No. 989, 95th Cong., 2d. Sess. 7 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5793.  "The discharge provisions require the court to grant the debtor a discharge of all his debts except for very specific and serious infractions on his part." *Id.*

*In re Ichinose*, 946 F.2d 1169, 1172 (5th Cir. 1991).

Consistent with this general approach, it is the Plaintiff who has the burden of proving an objection to discharge under § 727(a)(4)(A). ***Beaubouef***, 966 F.2d at 178.  "The elements of an objection to discharge under § 727(a)(4)(A) must be proven by a preponderance of the evidence." ***Id.***  Those elements are: "'(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.'" ***In re Pratt***, 411 F.3d 561, 566 (5th Cir. 2005), *quoting **Beaubouef***, 966 F.2d at 178.  "An omission of an asset can constitute a false oath." ***Id.***

---

[3] Curiously, the chapter 7 trustee found no reason for objection under § 727(a) and, specifically, § 727(a)(3).  Notably, no taxing authority complained of the Defendant's recordkeeping.

Moreover, "Bankruptcy Courts have not construed § 727(a)(4) generally to impose strict liability for the schedules and false statements." *Interfirst Bank Greenville, N.A., v. Morris (In re Morris)*, 58 B.R. 422, 427 (Bankr. N.D. Tex. 1986) (McGuire, J.).  Innocent mistakes and inadvertence are generally not sufficient to result in denial of a discharge.  *See e.g., Mozeika v. Townsley (In re Townsley)*, 195 B.R. 54, 65 (Bankr. E.D. Tex. 1996) (Sharp, J.) ("The denial of a discharge under § 727(a)(4)(A) cannot be imposed where the false statement was the result of a simple or honest mistake or inadvertence.  Rather, to sustain an objection to discharge under this section, the debtor must have willfully made a false statement with intent to defraud his creditors.").

A debtor need not have acted deliberately to deceive, however.  *Beaubouef*, 966 F.2d at 178 ("It makes no difference that [the debtor] does not intend to injure his creditors when he makes a false statement.  Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them."), *quoting In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984).  The requisite intent can be shown by establishing that the debtor acted with reckless disregard for the truth, which can be proven by circumstantial evidence.  *In re Sholdra*, 249 F.3d 380, 382 (5th Cir.), *cert. denied,* 534 U.S. 1042 (2001) ("statements made with fraudulent intent–or reckless indifference to the truth . . . can be proven by circumstantial evidence"); *Beaubouef*, 966 F.2d at 178 ("the existence of more than one falsehood, together with [the debtor's] failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive"); *accord, Ford v. Mellon Fin. Serv. Corp. (In re Ford)*, 1986 WL 14997, *4 (S.D. Tex.) ("When impeached, Debtor candidly admitted that expediency motivated the deception.  Such reckless disregard for the truth is circumstantial evidence of the requisite

fraudulent intent and will alone support denial of discharge."); *In re Sullivan*, 204 B.R. 919, 942-43 (Bankr. N.D. Tex. 1997) (Abramson, J.) ("A series of even innocent mistakes or omissions can constitute evidence of a pattern of reckless disregard for the truth. . . .  Thus, courts look at the circumstances surrounding the omissions to determine whether they were intentional."), citing *Morris*, 58 B.R. at 428.

The Plaintiffs identify three of the Debtor's responses in his Schedules or Statement of Affairs that they claim are either false or so incomplete that they constitute a false oath and, when those three items are taken together, warrant denial of his discharge.  There is no dispute that each of these responses are statements made under oath.  *Beaubouef*, 966 F.2d at 178 ("It is undisputed that the schedules filed by [the debtor] constitute statements under oath within the meaning of § 727(a)(4)(A).  Bankruptcy Rule 1008 requires that '[a]ll petitions, lists, schedules, statements of financial affairs, [etc.] shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746.'"), citing 4 *Collier on Bankruptcy* ¶ 727.04[1], at 727-59 (15th ed. 1992).  Whether the Plaintiffs have satisfied their burden of establishing the other elements of a 727(a)(4)(A) action is, however, hotly disputed.

The Plaintiffs cite to the following misstatements and/or omissions as a basis for the denial of discharge under § 727(a)(4).  First, Plaintiffs assert that Atkins filed a proof of claim for unpaid wages in the Scooter Revolution case in the amount of $54,150.  (P-82.)  Second, Plaintiffs point to Atkins' deposition that he was uncertain as to the amount of his unpaid wages -- somewhere between $25,000 to $35,000.  Third, in the Scooter Revolution Statement of Financial Affairs, Atkins is listed as having a claim for unpaid wages in the amount of $1,050. (P-85.)

Plaintiffs argue that the Court should focus on the materiality of the statements and if it bears a relationship to the debtor's business transactions or estate. ***Partners in Family Medicine P.A v. Nolen (In re Nolen)***, Adversary No. 07-01008 (Bankr. W.D. Tex. December 18, 2007). As an initial matter, the Court notes that both the Defendant and his wife filed proofs of claim one day after the bar date. The Trustee in Scooter Revolution moved to have the claims treated as late filed unsecured claims (doc. #42). The Court signed an Order which re-classified Defendant's and his wife's proof of claims as late filed unsecured claims (doc. #43). As such, Defendant and his wife could not receive any distribution on their claim until all other claims (including Plaintiffs) were paid in full.

The Court finds that the Plaintiffs have not met their burden under section 727(a)(4). While the Court does not condone lackluster recordkeeping or the Defendant's inability to determine correctly his unpaid wages, the omissions and misstatements are not material to denying the Defendant's discharge under section 727(a)(4). As noted, the Defendant did not profit by his purported misconduct. Further, there is no dispute that Defendant did not use a payroll service and apparently paid employees with cash. Nonetheless, the Court's docket does not indicate any wage claims other than Defendant's. Further, Defendant's inconsistent statements regarding his unpaid wages has no effect or relevance to his misrepresentations to Plaintiffs about scooter sales because there is no evidence that Defendant paid himself a salary in lieu of making note payments to the Plaintiffs. In sum, while the proof of claims may have been incorrect, their materiality to the Plaintiffs' claims under section 523 and 727 is not a basis for denial of discharge under section 727(a)(4).

Section 727(a)(5)

Section 727(a)(5) provides in relevant part that a debtor will be denied a discharge where the debtor fails to explain satisfactorily the loss of assets or deficiency of assets to meet the debtor's liabilities. Section 727(a)(5) does not require specific allegations of fraud but does require that the Plaintiff identify which assets have been lost. *See Nof v. Gannon*, 173 B.R. 313 (Bankr. S.D.N.Y. 1994) (denial of discharge warranted on fraudulent withholding of information).

The initial burden is on Plaintiffs to show some evidence that assets have been lost and then for the debtor to explain what happened to the assets. *See Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616 (11th Cir. 1984) (*per curiam*) (denial of discharge warranted for failure to explain loan of $130,000 to debtor). The burden on the debtor is to explain satisfactorily to the Court what has happened because the debtor has access to the operative facts. *Poolquip-McNeme, Inc. v. Hubbard (In re Hubbard)*, 96 B.R. 739 (Bankr. W.D. Tex. 1989).

Plaintiffs carefully and persuasively identified specific assets (scooter inventory, cash) that were sold or dissipated for which the Defendant could not explain their loss. First, the Plaintiffs not only showed that Defendant did not order the 337 scooters as required under Note Three, but the Defendant could not explain the disappearance of roughly $68,000 in loan proceeds that were not remitted as payment for the scooters. Defendant acknowledged as much in the amendment to Note Three. (P-4.) The Defendant provided no proof that there ever was additional scooter inventory to collateralize Note Three. Also, as detailed in the chart contained herein, the Defendant sold certain scooters and never reported the sales to the Plaintiffs. The evidence for the sale of the scooters are contained in Plaintiffs' exhibits regarding sales orders, title application receipts, invoice and registration and title information. (P-105, 125-28, 130,

131, 132, 133-39.)  *See* ***McBee v. Sliman***, 512 F.2d 504 (5th Cir. 1975) (failure to explain loss of $14,000 cash resulted in denial of discharge).

The Plaintiffs demonstrated that there were transfers of money between the Defendant and his wife's personal accounts and Scooter Revolution's account, without explaining why the transfers were made, or what happened to the money after the transfers were made.  Further, as discussed herein, the Defendant made a number of purchases for personal items from the Scooter Revolution account that bore no relationship to the business' operations.  The personal items purchased were done in contravention of the Note Three limitations on how the loan proceeds could be spent.  As the Court has already noted, the issue in this case was not a lack of complete records, but based on the bank statements, the Defendant had no credible or satisfactory explanation for how or why transfers for payments from Scooter Revolution's were legitimate or necessary business expenses.  As such, the Court finds that the Defendant has failed to explain satisfactorily purchases for personal items, transfers of money or sales of scooter inventory.  The Defendant's discharge is denied under Section 727(a)(5).

Section 523(a)(2)(A&B)

(a)  A discharge under section 727 . . . does not discharge an individual debtor from any debt—
(2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
(A)  false pretenses, a false representation, or actual fraud, other than a statements respecting the debtor's or an insider's financial condition;
(B)  use of a statement in writing—
(i)  that is materially false;
(ii)  respecting the debtor's or an insider's financial condition;
(iii)  on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv)  that the debtor caused to be made or published with the intent to deceive; or
(4)  for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; [or]

(6)     for willful and malicious injury by the debtor to another entity or to the property of another entity.

The Tenth Circuit has explained that the difference between section 523(a)(2)(A) and 523(a)(2)(B) may be explained as follows:

> Specifically, 11 U.S.C. § 523(a)(2)(A) states that a debt obtained by "false pretenses, a false representation, or actual fraud" is not dischargeable. However, § 523(a)(2)(A) contains an exception: If a debt is obtained by a false oral "statement respecting the debtor's . . . financial condition," the debt is dischargeable. By contrast, 11 U.S.C. § 523(a)(2)(B) states that a debt obtained by a false written statement "respecting the debtor's . . . financial condition" is not dischargeable, provided certain conditions are met.

*Materials Prod. Int'l, Ltd. v. Ortiz (In re Ortiz)*, 441 B.R. 73 (W.D. Tex. 2010), citing *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 704 (10th Cir. 2005).

The Tenth Circuit noted that both section 523(a)(2)(A) and 523(a)(2)(B) use the phrase "respecting the debtor's . . . financial condition" and that both sections were enacted as part of the original statute. *Id*. The Tenth Circuit then noted that although (A) and (B) use similar language, Section 523(a)(2)(A) provides that a false oral statement respecting the debtor's financial condition is dischargeable, while Section 523(a)(2)(B) provides that a debt obtained by a false written statement of the same version is not dischargeable. *Id*. Therefore, whether the statement is oral or written may determine if the statement is dischargeable. *Id*.

The Tenth Circuit also noted that:

> The phrase "respecting the debtor's . . . financial condition" has a range of potential meanings. . . . [M]any of the courts who have considered this issue refer to as the "broad interpretation," a statement "respecting the debtor's . . . financial condition" is any communication that has a bearing on the debtor's financial position. *Id.* citing *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 614 (Bankr. D. Utah 2002). Thus, the broad interpretation posits that a communication addressing the status of a single asset or liability qualifies as "respecting the debtor's . . . financial condition." *See id.*
>
> Under what courts refer to as the "strict interpretation," a statement "respecting the debtor's . . . financial condition" is any communication that presents an overall picture of the debtor's financial position. *Id.* at 615. This interpretation

27

limits statements "respecting the debtor's . . . financial condition" to communications that purport to state the debtor's overall net worth, overall financial health, or equation of assets and liabilities. *See id.*

Subsections § 523(a)(2)(A) and (a)(2)(B) define similar, *but nevertheless different*, causes of action. *See Field v. Mans*, 516 U.S. 59, 64 (1995) ("11 U.S.C. § 523(a) . . . carries 16 subsections setting out categories of nondischargeable debts [and t]wo of these are debts traceable to falsity or fraud or to a materially false financial statement, as set out in § 523(a)(2) . . .") (emphasis added). The Supreme Court in *Field v. Mans* reviewed the independent histories of the two provisions and noted the "significance of a historically persistent textual difference between the substantive terms in §§ 523(a)(2)(A) and (B)[, in that] the former refer to common law torts, and the latter do not." *Id*. at 68-69. The Court then described § 523(a)(2)(A) and § 523(a)(2)(B) as:

> two close statutory companions barring discharge. One applies expressly when the debt follows a transfer of value or extension of credit induced by falsity or fraud (not going to financial condition), the other when the debt follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied.

The import of sections 523(a)(2)(A) and 523(a)(2)(B) is that the Defendant made a false statement (written or oral) that fraudulently induced the Plaintiffs into extending credit. As an initial matter, there was no evidence provided at trial about Defendant's oral statements to Plaintiffs that purportedly induced them into making a loan to Defendant.

More importantly, there was no evidence that was provided at trial, or in written documents, that demonstrates that the Defendant provided any document that induced Plaintiffs to loan him money. Rather, the evidence was clear that based upon the friendship between Plaintiffs (primarily MDR) and Defendant, and their mutual interest of starting a business together, was the basis for lending money to Defendant. The Plaintiffs did not ask for any

financial statements from Defendant or rely on any written documents in loaning money to Defendant. In sum, there was no inducement or reliance through fraud or written documents.

<u>Section 523(a)(4)</u>

Section 523(a)(4) does not discharge an individual debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny. ***Walser v. Texas Music Group, Inc., et al. (In re Antone's Records, Inc.)***, 445 B.R. 758 (Bankr. W.D. Texas 2011).

<u>Breach of Fiduciary Duty</u>

In ***Antone's***, this Court held that a breach of fiduciary duty may only occur if a fiduciary relationship existed. ***Id.*** at 780. A fiduciary relationship may be based on formal or informal relations in which one person places a special confidence in another who, in equity and good conscience, is bound to act in good faith and with due regard for the interest of the person placing the confidence. *See **Texas Bank & Trust Co. v. Moore***, 595 S.W.2d 502, 507 (Tex. 1980); ***Lacy v. Ticor Title Ins. Co.,*** 794 S.W.2d 781, 788 (Tex. App.—Dallas 1990), writ denied, 803 S.W.2d 265 (Tex. 1991). The Fifth Circuit has held that a fiduciary duty is one of special trust or confidence arising prior to and apart from the transaction in question. ***In re Monnig's Dept. Store***, 929 F.2d 197 (5th Cir. 1991).

<u>Informal Fiduciary Relationship</u>

An informal fiduciary relationship may be created where a "special confidence" is placed in one person who "is bound to act in good faith and with due regard to the interests of the one reposing confidence." ***Antone's*** at 782, citing ***Texas Bank***, 595 S.W.2d at 507. Whether there is an informal fiduciary relationship is a question of fact based on the circumstances surrounding a "moral, social, domestic, or purely personal relationship." ***Thigpen v. Locke***, 363 S.W.2d 247,

253 (Tex. 1962).  Further, an implied or technical trust can give rise to a fiduciary duty.  *In re Nazarko*, 2008 Bankr. Lexis 262 (Bankr. E.D. Tex., January 31, 2008).

The Fifth Circuit has defined "defalcation" as a willful neglect of duty, even if not accompanied by fraud or embezzlement.  *In re Schwager,* 121 F.3d 177, 184 (5th Cir. 1997). Moreover, a willful neglect of fiduciary duty can constitute a defalcation.  *Id.* at 185. Embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."  *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998).

The record is clear and both parties acknowledged and testified that there had been a close friendship that pre-dated Plaintiffs' extension of credit to Defendant.  In fact, the reason that Plaintiffs gave Defendant the loans was because they were close personal friends and that Plaintiffs trusted Defendant.  Nonetheless, each of the three loans to Defendant provided that the loans were made for business purposes, and that the loans could not be used for family, household or consumer purposes.  (P-1 - P-3.)[4]

The Defendant was loaned sufficient proceeds from Note Three (P-4) to buy 337 scooters, yet he knew when he placed the order with Flyscooters LLC that he would only order 290 scooters.  (P-97.)  He admitted as much at his deposition.  (Atkins Depo., p. 41/II 15-18.) Atkins memorialized the terms of repayment – 30% upfront, 70% when the inventory arrived in the United States – telling the Plaintiffs that the Note Three loan proceeds would be used to purchase the 337 scooters.  (P-150, P-151, P-152.)  The fact that Atkins did not buy the full

---

[4] The Defendant argued that because the Plaintiffs did not file a UCC-1 financing statement until sometime after the notes were negotiated, that the Plaintiffs' security interest in the scooter inventory was not properly perfected.  That is not correct.  The delay in filing the UCC-1 only affects priority of security interests.  Generally, a security interest attaches to collateral when: (1) a debtor authenticates a security agreement that provides a description of the collateral; (2) the secured party gives the debtor value for the security interest; and (3) the debtor has rights in the collateral.  TEX. BUS. & COM. CODE ANN. § 9.203(b) (Vernon 2002 and Supp. 2005.)

inventory of 337 scooters and only purchased 290 scooters, and that he admitted using the loan proceeds for non-business purposes was acknowledged in the amendment to Note Three.  (P-4.)

The Defendant breached his fiduciary duty to the Plaintiffs when he did not purchase the 337 scooters as required by Note Three.  He committed defalcation when he failed to use note proceeds to pay for the scooters and did not retain the proceeds to pay Plaintiffs.  During the time frame that Defendant could not account for the loan proceeds, he transferred money between the Scooter Revolution business account and his and his wife's personal accounts, and Defendant made numerous purchases for entertainment, personal items, food and beverages, and miscellaneous items.  The Plaintiffs trusted Defendant to maintain their scooter inventory and operate their business with the money they lent Defendant.  Instead, Defendant failed to account for scooter sales and did not report same to Plaintiffs.  Defendant misappropriated Plaintiffs' money for his personal use.  Plaintiffs have met their burden under section 523(a)(4) and Defendant's debt to Plaintiffs is found to be non-dischargeable.

Section 523(a)(6)

Section 523(a)(6) provides that an individual debtor will not get a discharge from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  For the act to be willful and malicious "a debtor must have acted with 'objective substantial certainty or subjective motive' to inflict injury."  *In re Williams*, 337 F.3d 504, 508-09 (5th Cir. 2003) (citing *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998)).  Whether the acts were substantially certain to cause injury (the "objective test") is based on "whether the Defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the Plaintiff."  *In re Powers*, 421 B.R. 326, 335 (Bankr.

W.D.Tex. 2009) (emphasis in original).  A subjective motive to cause harm (the "subjective test") exists when a tortfeasor acts "deliberately and intentionally, in knowing disregard of the rights of another."  *See **In re Miller***, 156 F.3d at 605-06 (adopting the definition of "implied malice" from ***In re Nance***, 566 F.2d 602, 611 (1st Cir. 1977)).

The Supreme Court has determined that the word "willful" under Section 523(a)(6) modifies the word "injury," indicating that a finding of nondischargeability requires a deliberate or intentional injury, not merely a deliberate act that results in injury.  ***Kawaauhua v. Geiger***, 523 U.S. 57, 61 (1998).  In defining the term "malicious" under Section 523(a)(6), the Fifth Circuit holds that it means "implied malice," as opposed to "special malice." ***In re Miller***, 156 F.3d at 605.  "Implied malice" means "acts done with the actual intent to cause injury," whereas "special malice" requires a showing of a motive to harm.  ***Id.***  The Fifth Circuit, in recognizing that the definition of implied malice is the same standard used by the Supreme Court for "willful injury," held that a finding of implied malice can render a debt nondischargeable under Section 523(a)(6).  ***Id.*** (discussing ***Kawaauhua***, 523 U.S. 57).

The Defendant's conduct was not willful and malicious under the objective test.  There was no evidence produced that showed that Defendant intended to harm Plaintiffs; it was that Defendant committed deliberate acts that resulted in an injury to Plaintiffs.  The Defendant and his wife testified at length how sorry they were and that they did not mean or intend not to repay the Plaintiffs.  Regrettably, like many persons in their situation, they unrealistically thought that their economic situation would improve just with the passage of time even though they had no plan to restructure their business operations other than to restructure their debt.

Under the subjective test, the Plaintiffs must show that the Defendant acted deliberately and intentionally with knowing disregard of the Plaintiffs' rights.  The court finds the Plaintiffs

have met their burden.  The Defendant should have known that the failure to purchase all of the scooters and/or retain the loan proceeds placed the Plaintiffs at risk.  Further, not only did the Defendant neglect to honor the requirements of Note Three, he carelessly and recklessly spent money on personal items and made unauthorized transfers of funds that were not for business purposes.  He did so without maintaining accurate records so it was difficult to ascertain fully the extent of his recklessness.  That said, Defendant committed acts that not only took significant monies out of Scooter Revolution without any legitimate business purpose, but Atkins did so over a time period in which Plaintiffs were at risk of not being repaid.  Plaintiffs have met their burden under section 523(a)(6).

### CONCLUSION

For the reasons stated herein, the Plantiffs' Complaint pursuant to section 523 and 72 is GRANTED under section 523(a)(4&6) and section 727(a)(2, 5, and 7).  Pursuant to FED. R. CIV. P. 54, FED. R. BANKR. P. 7054, and Local Rule 7054, the Plaintiffs may make application for attorney's fees.  All other relief is DENIED.

# # #